# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jason Blais, individually and as Trustee For the Heirs and Next of Kin of Karen Larson,<br><br>    Plaintiff,<br><br>v.<br><br>United States of America,<br><br>    Defendant and<br>    Third Party Plaintiff,<br><br>    v.<br><br>Virginia L. Klemish,<br><br>    Third Party Defendant. | Case No. 18-cv-2762 (SRN/LIB)<br><br><br>**ORDER ON DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |

Stephen Douglas Gabrielson, Gabrielson Law Offices, Ltd., 18 Riverside Ave. S., Ste. 200, Sartell, MN 56377, for Plaintiff.

Gregory G. Brooker and Erin M. Secord, United States Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for Defendant United States of America.

Blake W. Duerre, Arthur, Chapman, Kettering, Smetak & Pikala, PA, 81 S. 9 St., Ste. 500, Minneapolis, MN 55402, for Third Party Defendant Klemish.

---

SUSAN RICHARD NELSON, United States District Judge

   This matter is before the Court on the Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) [Doc. No. 44] filed by Defendant United States of America. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** Defendant's motion.

## I.    BACKGROUND

The underlying facts of this Federal Tort Claims Act lawsuit concern a tragic automobile accident that occurred on September 30, 2015.

### A.    Paul Baron's Employment with the United States Postal Service

Since September 12, 2000, Paul Baron has been employed as a rural mail carrier for the United States Postal Service ("USPS"). (Compl. [Doc. No. 1] ¶ 8.) On September 30, 2015, he worked out of the Burtrum Post Office in Long Prairie, Minnesota, where his direct supervisor was Long Prairie Postmaster Mark R. Sobotka. (*Id*. ¶ 9.) From February 2014 to January 2016, Baron delivered mail on Rural Route K-021 ("Route 21"). (*Id.* ¶ 10.)

On a typical work day, Baron would arrive at the Burtrum Post Office after the USPS truck had delivered the mail, and the part-time postal clerk had sorted it. (Def.'s Ex. Index [Doc. No. 47], Exs. at USA_SJ_164–67.[1]) After arriving at the post office between 7:30 and 8:30 a.m., Baron would write his arrival time on the route timesheet, (called a "Trip Report"), and then sort the mail in the order of delivery along Route 21. (USA_SJ_102–03, 165, 247, 356, 562.) He would place the mail in trays, load them in his car, record the time he left the post office on the Trip Report, and begin his route. (USA_SJ_103, 165.) After he completed his deliveries on Route 21, Baron would return

---

[1]    Defendant's exhibits [Doc. No. 47-1] are attached to Defendant's Exhibit Index [Doc. No. 47], and are cited by Bates-stamped page numbers, preceded by "USA_SJ_." Plaintiff's exhibits [Doc. No. 54-1] are attached to Plaintiff's Exhibit Index [Doc. No. 54], and are cited by Bates-stamped page numbers, preceded by "Blais_SJ_."

to the Burtrum Post Office, record his time of arrival on the Trip Report, and drop off any undelivered mail and any mail received from customers on his route. (USA_SJ_103–04, 166–67.) Then he would record the time he completed his duties on the Trip Report, and leave the post office. (*Id.*) Typically, no other employee was present at the Burtrum Post Office at this time, as the part-time postal clerk only worked from 7:15 until 11:15 a.m. (USA_SJ_103–04, 154, 166, 311.)

As a rural mail carrier, Baron is required to provide his own vehicle for work on his assigned route. (Compl. ¶ 10; Blais_SJ_27–29.) After becoming a full-time mail carrier in 2014, Baron removed the driver's seat from his 2001 left-hand drive Chevy Lumina, one of the vehicles that he used on his route, (USA_SJ_36–37), and the vehicle that he used on September 30, 2015. (USA_SJ_627.) He altered the vehicle to make it "easier to do [his] job." (USA_SJ_37.) In place of the driver's seat, Baron installed a wooden shelf on which he placed the mail trays. (USA_SJ_36–37.) He operated the Chevy Lumina while seated in the front passenger seat, using his left foot to apply the accelerator and brake, which were located on the left-hand side. (USA_SJ_123–24; Compl. ¶11.) No one from the USPS told Baron to modify his vehicle in this way, (USA_SJ_175), and Baron testified to his awareness that USPS Handbook PO-603, *Rural Carrier Duties and Responsibilities,* ("Rural Carrier Handbook"), requires right-hand controls for right-hand drive vehicles, and left-hand controls for left-hand drive vehicles. ( USA_SJ_113.)

Baron also testified that he did not inform anyone in the USPS about the modification to his Chevy Lumina, and was uncertain whether anyone in the USPS was aware of it. (USA_SJ_52–53, 181.) His supervisor, Postmaster Sobotka, stated that he

was unaware of Baron's removal of the driver's seat, and that he would have told Baron to correct it if had he known about it. (USA_SJ_218–23, 260–61, 280–81.) While Sobotka's regional supervisor, Manager of Post Office Operations Martin Brumbaugh, did not testify that he was aware of the modification, he stated that if he had been aware of it, he would have instructed Baron to correct the vehicle. (USA_SJ_399–400, 436–39.) Cheryl Knoll, a part-time clerk at the Burtrum Post Office, testified that while she was aware of the modification, she would have reported it to Postmaster Sobotka had she known it violated USPS policy. (USA_SJ_544, 559.)

Five months before the accident, in April 2015, Postmaster Sobotka asked Tanya Barthel, a part-time clerk at the Burtrum Post Office, to perform an inspection of Baron's vehicle, using a Rural Carrier Vehicle Inspection Checklist, and to observe Baron's driving ability using an Observation of Driving Practices form. (USA_SJ_337–45, 616; Blais_SJ_41–42.) Instead of the Chevy Lumina, Baron presented a car with a driver's seat for inspection, his 1996 Buick Century. (USA_SJ_150–51, 338–44; Blais_SJ_42.) Ms. Barthel conducted a ride-along in the Buick Century on Baron's route on April 23, 2015, and completed the corresponding Observation of Driving Practices form. (USA_SJ_338–44, 615, 645–46.) She was aware of the modification to Baron's Chevy Lumina and testified that she told Postmaster Sobotka that she would not ride in the Chevy Lumina for the ride-along because she would have nothing to sit on. (USA_SJ_332, 338–39.)

### B.    Day of the Accident

On the day of the accident, Baron reported to the Burtrum Post Office at 7:45 a.m. in his Chevy Lumina. (USA_SJ_104–08, 164.) After he sorted the mail, he left for his

route at 9:00 a.m. (USA_SJ_104–05.) Baron entered those times on his Trip Report, and also noted that one tray of mail for his route was missing, as it had not yet been delivered to the Burtrum Post Office. (USA_SJ_163.) While he typically had three trays of mail to deliver on approximately 470 stops, on September 30, 2015, he only had two trays to deliver on approximately 310 stops. (USA_SJ_164.) After finishing his route, Baron testified that he returned to the Burtrum Post Office at 2:05 p.m., at which time he returned the trays, along with any undelivered mail, and left the post office at 2:15 p.m. (USA_SJ_105–13, 165–66.)

Baron's time entries were recorded in military time, which he disliked because he had difficulty using it. (USA_SJ_104–13.) He testified that his time sheets contained frequent corrections due to his "goof[] up[s]" with military time. (USA_SJ_109–11.) His time entry for September 30, 2015 contains a correction that is difficult to decipher. (USA_SJ_632–41.) Baron testified that he reported back at the post office at 2:05 p.m. that afternoon, and noted that on the two preceding days, when he had three full trays of mail to deliver, he arrived back at the post office at 3:30 p.m. and at 3:10 pm. (USA_SJ_110–13, 632.)

Typically, the Burtrum Post Office clerk or Postmaster Sobotka would enter the Trip Reports into the USPS pay system. (USA_SJ_249, 377–79, 551, 560, 587.) Baron's pay stub for the two-week period that includes the date of the accident reflects 22 work hours, consistent with the number of hours reported on his Trip Reports. (USA_SJ_654, 657.)

Baron testified that after leaving the post office at 2:15 p.m. on September 30, 2015, he started his usual commute home to Browerville, Minnesota, driving north on Morrison

County Road 31. (USA_SJ_127.) He testified that he left County Road 31 briefly to stop at Loven's Auto Center in Swanville, Minnesota to pay a bill for repairs to his Chevy Lumina. (USA_SJ_127–28, 167.) Loven's Auto Center is approximately a five-minute drive from the Burtrum Post Office. (USA_SJ_168.) Baron testified that after speaking with Jay Loven, he learned that his bill was not ready, so he proceeded home, driving northward. (USA_SJ_168, 617–25.)

At approximately 2:30 p.m., a vehicle driven by Karen Larson was traveling southbound on Morrison County Road 31, while Baron was driving northbound on the same road, outside of his delivery area. (USA_SJ_84, 119–23, 626–28.) A vehicle driven by Virginia Klemish entered the highway, traveling northbound, ahead of Baron. (*Id.*) When Baron attempted to pass Klemish by moving into the oncoming lane, he did not see Larson's vehicle, which he struck head-on. (*Id.*) Specifically, the accident site was north of the intersection of Morrison County Road 31 (also named 10th Avenue) and Autumn Road, north of Swanville, in the township of Culdrum, outside of Baron's delivery area. (USA_SJ_119–23, 626–29.)

Klemish, who was uninjured, dialed 911. (USA_SJ_626–29.) First responders transported Larson to the hospital in St. Cloud, where she died. (USA_SJ_628.) Baron broke two bones in his wrist and a bone near his elbow, and was taken to the Long Prairie Hospital by his brother. (USA_SJ_183–84, 607.)

Officer Mark Dzieweczynski of the Morrison County Sheriff's Office filed an incident report concerning the accident. (USA_SJ_626–29.) In the narrative section of his report, he commented, "It should be noted that Baron is a rural mail carrier and was on

his way home from work at the time, so Baron was operating his motor vehicle from the front right passenger seat. Baron's vehicle was not equipped with a driver's seat. This vehicle is a conventional left-hand steer vehicle." (USA_SJ_628.)

In his deposition, Baron testified that at the time of the accident, he had completed all of his work duties and was heading home. (USA_SJ_112, 168–69.) Both Baron and Postmaster Sobotka testified that Sobotka had not assigned Baron any additional duties to perform that day. (USA_SJ_168–69, 271.) Baron's car contained personal papers, but he testified that no undelivered mail was in the vehicle. (USA_SJ_115, 171.)

After Baron was released from the hospital that afternoon, he visited Postmaster Sobotka between 4:00 and 4:30 p.m., and informed him that he had been involved in an accident. (USA_SJ_15, 256–57, 261–65.) Sobotka called Post Office Operations Manager Brumbaugh, based in St. Cloud, Minnesota, as well as a USPS official in Minneapolis. (USA_SJ_258–59, 261–65, 278–80, 399–400, 404–05, 647–49.) They determined that because the accident occurred when Baron was off duty, a USPS accident report was unnecessary. (USA_SJ_229–31, 257–59, 261–65, 278–80, 467, 647–49.)

On October 2, 2015, Brumbaugh contacted USPS officials in Minneapolis, stating,

> Paul Baron is a FT rural carrier out of Burtrum MN. On his way home from work he was involved in this accident. He did make a stop after leaving work and before the accident so I am not treating this [as] a postal accident but thought all should be made aware of this. The carrier is not at work today. He called in with a sore wrist he says was from the accident. The postmaster has talked to the carrier and offered EAP contact information.

(USA_SJ_648.) He attached to the email a news story about the car accident. (*Id*.)

Later that day, a USPS official in Minneapolis replied:

Thank you. No accident report needed. In this case, the accident is not in any way attached to employment. Sherry and I spoke and you are correct, the portal to portal stopped at the deviation point. However, if for some reason, the employee requests to file a claim, the CA form needs to be processed and at that point, an accident report is required because a claim cannot be processed without an accompanying 1769. Thanks for covering EAP. I'm so sorry to hear of this and my heart goes out to the family that lost a loved one.

(USA_SJ_647.) The "CA form" to which the USPS official referred is the U.S. Department of Labor's form for worker's compensation. (*See* USA_SJ_650–53.)

In his deposition, Post Office Operations Manager Brumbaugh testified that he was familiar with the Rural Carrier Handbook, which applies to rural mail carrier duties and responsibilities. (USA_SJ_401–02.) In particular, Brumbaugh was familiar with Section 17 which covers "Traffic Safety and Accident Reporting," and provides:

171.5 Protection

171.51 Federal Employees' Compensation Act (FECA)

   a. Seat Belt Requirements—Driving Own Vehicle

Rural carriers are protected under FECA in the event they sustain an injury while in the performance of duty. Rural carriers are considered to be in the performance of duty for purposes of FECA when driving their own vehicle between their home and the post office, and between the post office and their home, provided Postal Service records indicate that the Postal Services required the carrier to furnish the vehicle.

(USA_SJ_415, 611.)

Based on "[t]he Postal Service bylaws or however you want to put it" and Brumbaugh's "training in the [Rural Carrier Handbook PO-]603," he testified to his understanding that when a postal employee makes a personal stop while traveling between work and home, he is considered "off duty" due to the stop, for purposes of both workers'

compensation and tort claims.  (USA_SJ_412–13, 418–19.)  But if an employee is merely driving from the post office to his home, "he's on the clock," or "on duty."  (USA_SJ_413.)  However, Mr. Brumbaugh also conceded that he was not tasked with interpreting the FECA policy on behalf of the USPS.  (USA_SJ_471.)

## C.  Events After the Accident

On October 6, 2015, at the request of a USPS official in Minneapolis, Baron prepared the following statement, (USA_SJ_18–19), describing the circumstances of the accident:

> Re:  accident 9/30/15 – Paul Baron
>
> When I was done working I left the Burtrum Post Office, went into Swanville, stopped and talked to the repair shop about some repairs.  I then proceeded to go home, taking the Morrison/Todd County Line Road.  A car had pulled out of a side road/driveway and was going slow in front of me, I attempted to pass this vehicle when I felt it was clear to pass, as I went to go around the car in front of me there was a car in the other lane, I did not see it.  We hit front corners.  I attempted to call 911—my airbags deployed—the other car's air bags did not deploy and she was not wearing her seat belt.  Emergency vehicles/sheriffs came to the scene.  They took the lady by ambulance and I had my brother take me to Long Prairie Medical Center where I had my arm/wrist x-rayed—I have 2 small broken bones in my wrist and one higher up before the elbow.

(USA_SJ_607.)

In October 2015, Baron returned to work at the Burtrum Post Office.  (USA_SJ_171.)  On approximately March 21, 2016, Baron requested and obtained a statement signed by Jay Loven, owner of Loven's Auto Center.  (USA_SJ_13–18, 132–34.)  The statement, written on company letterhead, states:

> On September 30th, 2015 at approximately 2:15 pm, Paul Baron stopped at Loven's Auto Center to pay a bill for work done on his 1998 Chevrolet

> Lumina. The invoice was not ready at the time, so Paul left and returned at
> a later date to pay the bill.

(USA_SJ_603–06.) Loven testified that although he could not recall signing the statement, he would not have signed the statement if it were untrue. (USA_SJ_497–504.) He further testified that his shop performed the work on the Lumina on September 22, 2015, created the invoice on October 5, 2015, and Baron paid the bill on October 7, 2015. (USA_SJ_504–06.)

In September 2018, Plaintiff Jason Blais, the trustee appointed for Ms. Larson's heirs and next of kin, filed this lawsuit against the United States, asserting claims of negligence and negligent supervision against the United States. (Compl. ¶¶ 28–34.) The parties proceeded with discovery, and the Government now brings this motion to dismiss. Plaintiff opposes the motion.

## II. DISCUSSION

### A. Standard of Review

The Government moves to dismiss under Rule 12(b)(1), arguing that the Court lacks subject matter jurisdiction because the claims are not within the United States' limited waiver of sovereign immunity under the FTCA. (Def.'s Mem. Supp. Mot. to Dismiss ("Def.'s Mem.") [Doc. No. 46] at 3.)

"In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings." *Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn v. United States*, 918 F.2d 724, 729 & n.6 (8th

Cir. 1990)).  Where the factual record is developed, in a Rule 12(b)(1) factual attack, the court may resolve disputed facts without applying the presumption of truth to the non-moving party's allegations or evidence, as it would in a motion to dismiss brought under Rule 12(b)(6).  *Id.* ("In a factual attack, the 'non-moving party does not have the benefit of 12(b)(6) safeguards.'").  However, if the jurisdictional question is "bound up" with the merits of the case, the district court may consider the evidence under the summary judgment standard.  *Id.* (citing *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018)).  Under the summary judgment standard of review, the court views the evidence in the light most favorable to the nonmoving party, *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and may only grant summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a)

Here, the Court finds that the Government's motion presents a factual attack to subject matter jurisdiction under Rule 12(b)(1), therefore, no presumptive truthfulness applies to Plaintiff's allegations, as it would under Rule 12(b)(6).  *Croyle*, 908 F.3d at 380.  Nor will the existence of disputed facts preclude the Court from considering the merits of the jurisdictional claims.  *Moss v. United States*, No. 4:12-cv-4030, 2017 WL 1158087, at *4 (W.D. Ark. Mar. 28, 2017), *aff'd*, 895 F.3d at 1091.  The Government's motion centers on the limited question of whether Baron was acting within the scope of his employment at the time of the accident.

Plaintiff argues that the question is so "bound up" with the merits of the case that the Court should apply the summary judgment standard of review.  (*See* Pl.'s Mem. in

Opp'n ("Pl.'s Opp'n") [Doc. No. 55] at 22) ("Genuine issues of material fact concerning whether Larson's death was caused by a negligent act of a USPS employee acting within the scope of employment exist, and particularly considering the inconsistent positions between the USPS and the United States' motion to dismiss and the fact that no formal investigation took place after a motor vehicle accident resulting in a fatality, a full trial on the merits may be necessary to resolve the scope of employment issue."). The Government disagrees, asserting that the merits of this case are not bound up with the jurisdictional evidence, and the Court should apply the Rule 12(b)(1) standard. (Def.'s Reply [Doc. No. 56] at 6.)

The Court finds that the Rule 12(b)(1) standard applies to this motion. In *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008), the Eighth Circuit considered a similar jurisdictional challenge in an FTCA case involving a Bureau of Indian Affairs correctional officer who had allegedly committed torts while arresting the plaintiff. The Eighth Circuit acknowledged that while generally, the question of whether an employer's actions fall within the scope of employment is a question of fact, the question in *Johnson* was not "so bound up with the merits that a full trial" was necessary to resolve the issue. *Id.* at 963–64 (citing *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986)). Rather, the court found that the issue of "whether [the employee's] conduct was within the scope of his employment [was] unrelated to whether [the employee's] conduct was negligent, which [was] the most important issue on the merits." *Id.* at 964. Here, as in *Johnson*, resolving the limited question of whether Baron was acting in the scope of his employment does not require the Court to evaluate the merits of the case, which concern whether he and the

USPS were negligent. Moreover, the jurisdictional facts relating to whether Baron was acting within the scope of his employment are easily separated from the issue of negligence. For all of these reasons, the Court applies the 12(b)(1) standard of review.

Courts have "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Johnson*, 534 F.3d at 964 (citation omitted). The record in this case, spanning nearly 700 pages, contains well-developed jurisdictional discovery. (*See* Def.'s Exs. [Doc. No. 47-1]; Pl.'s Exs. [Doc. No. 53-1].) Given the fulsome record, along with the parties' briefing and oral argument on the instant motion, the Court finds an evidentiary hearing unnecessary. *Johnson*, 534 F.3d at 964 (finding no abuse of discretion for failing to hold an evidentiary hearing where parties had ample opportunity to be heard through affidavits and briefs).

## B. Sovereign Immunity

"Sovereign immunity shields the federal government from suit absent its consent." *Croyle*, 908 F.3d at 381 (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). Under the FTCA, the Government waives its sovereign immunity for certain tort claims, authorizing private suits for the negligence of Government agents. 28 U.S.C. § 1346(b)(1). However, a threshold jurisdictional requirement under the FTCA is that the Government employee must be "acting within the scope of his office or employment" when he committed the alleged tort. *Id.* Courts must strictly construe conditions pertaining to the waiver of sovereign immunity, *Block v. North Dakota*, 461 U.S. 273, 287 (1983), and the plaintiff in an FTCA suit bears the burden of establishing that the government actor was acting within the scope of his or her employment. *Johnson*, 534 F.3d at 964.

The scope of employment is determined under the law of the state in which the tort occurred. *Id.* "However, FTCA claims are strictly limited to a scope of employment analysis, regardless of state law doctrines of respondeat superior and apparent authority." *St. John v. United States*, 240 F.3d 671, 676 (8th Cir. 2001) (citing *Primeaux v. United States*, 181 F.3d 876, 878 (8th Cir. 1999) (holding that apparent authority, as a separate theory of vicarious liability, should not be considered in FTCA claims)).

### C.     Scope of Employment for Negligence Claim

Under Minnesota law, an act occurs within the scope of employment if:

1. The employee's conduct was substantially within work related limits of time and place; and
2. The employee's conduct is of a kind authorized by the employer or reasonably related to that employment; and
3. The employee's act was motivated at least in part by the employee's desire to further the employer's interests; and
4. The employer should have foreseen the employee's conduct, given the nature of the employment and the duties relating to it.

Minn. CIVJIG 30.14, 4 *Minn. Prac. Jury Instr. Guide* (6th ed., Sept. 2020 Update); *Murray v. United States*, 258 F. Supp. 2d 1006, 1012 (D. Minn. 2003) (applying same Minnesota model jury instruction standard to determine whether conduct occurred within scope of employment in an FTCA claim), *aff'd*, 381 F.3d 810, 811 (8th Cir. 2004); *Hentges v. Thomford*, 569 N.W.2d 424, 427–28 (Minn. Ct. App. 1997) (applying factors stated in Minnesota model jury instruction to scope of employment analysis); *see also Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 15 (Minn. 1979) (stating that to support a finding that an employee's negligent act occurred within the scope of employment, "it must be shown that his conduct was, to some degree, in furtherance of the interests of his

employer," and courts may also consider "whether the conduct is of the kind that the employee is authorized to perform and whether the act occurs substantially within authorized time and space restrictions.") (citations omitted).  The question of whether an act occurred in the scope of employment depends on the facts of each case.  *Edgewater*, 277 N.W.2d at 15.

### 1.    Whether the Conduct Substantially Occurred Within Work-Related Limits of Time and Place

As to the work-related limits of time and place, the Government argues that no admissible evidence shows that Baron was delivering mail at the time of the accident. (Def.'s Mem. at 17; Def.'s Reply at 5.)  Moreover, it is undisputed, the Government contends, that the accident occurred approximately seven miles away from the closest point of Baron's delivery route.  (Def.'s Mem. at 17.)    The Government also cites Baron's testimony, and the accident report, which state that at the time of the accident, Baron was on his way home from work, after running a personal errand at Loven's Auto Center.  (*Id.*)

Plaintiff, however, argues that Baron was acting within the scope of his employment when the accident occurred.  (Pl.'s Opp'n at 27.)  He urges the Court to apply the more liberal construction of "scope of employment" applicable to USPS workers' compensation benefits, which may be awarded when a worker sustains an injury driving to or from work. (*Id.*)  Plaintiff further asserts that Baron's deviation from his route home was not substantial enough to remove his conduct from the scope of employment, and, at the time of the accident, he had abandoned the deviation.  (*Id.* at 35–36.)

Again, in order to establish that an employee's actions are within the scope of his or her employment, "[t]he conduct must occur within work-related limits of time and place." *Marston v. Minneapolis Clinic of Psychiatry*, 329 N.W.2d 306, 311 n.3 (Minn. 1982). For tortious conduct that occurs while employees are "going and coming" to and from work, such conduct does not generally fall within the employer's time or space, under Minnesota law. For example, in *Johnson v. Rivera*, No. C1-98-1922, 1999 WL 343860, at *1–2 (Minn. Ct. App. June 1, 1999), *review denied* (Minn. July 28, 1999), the employee in question, an Allina Health Systems nurse who visited patients in their homes, was driving home from her last appointment of the day after 5:00 p.m., when she received a personal page from her daughter on her employer-provided pager. The nurse reached to the floor of her car to retrieve her cell phone in order to call her daughter, at which point an accident occurred. *Id.* at 1. In order to impute negligence to the nurse's employer, the plaintiff argued that neither the personal page nor the intent to make a personal phone call removed the nurse from the scope of employment. *Id.* However, the Minnesota Court of Appeals found that the nurse was already outside the scope of her employment when she received the page and reached for her phone, as she was driving home from work when the accident occurred. *Id.*

In *Gackstetter v. Dart Transit Co.*, 130 N.W.2d 326, 329 (Minn. 1964), the court likewise found that an employee was not acting within the scope of his employment at the time of an accident that occurred after he had logged off work and was driving to his home town. *See also Mannes v. Healey*, 703 A.2d 944, 945–46 (N.J. Super. Ct. App. Div. 1997) (collecting cases, and stating that "[m]ost courts endorse the general rule that an employee

driving his or her own vehicle to and from the employee's workplace is not within the scope of employment for the purpose of imposing vicarious liability upon the employer for the negligence of the employee-driver") (internal citations omitted).

Similarly, in *Murray*, 258 F. Supp. 2d at 1011–13, the court applied Minnesota law, and found that an inactive duty teenage National Guard trainee was not acting within the scope of her "employment" when transporting National Guard brochures in her car at the time of an automobile accident. Although the trainee planned to distribute the brochures at her high school, she was off-duty at the time of the accident, en route to school, and the accident occurred several miles from her "workplace," and prior to the commencement of her National Guard duties at school. *Id.*; *see also Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994) (applying Iowa law on scope of employment, similar to Minnesota's, and finding that National Guard member was not within the scope of his employment under the FTCA when driving from his home to inactive duty training in a nearby town).

Here, it is undisputed that the accident did not occur near the Burtrum Post Office or along Baron's route. Rather, the accident was approximately seven miles from the closest point of Baron's route to the south. (USA_SJ_18, 626–29.) The sheriff's report states that Baron was driving north, away from his route and the Burtrum Post Office, and was on his way home at the time of the accident. (USA_SJ_626–29.) Baron likewise testified that he had finished his route, logged off on the Trip Report, had traveled north to Loven's Auto Shop in Swanville to pay a personal bill, and was driving home to Browerville when the accident occurred. (USA_SJ_112, 125–27, 168–70, 607.)

Plaintiff invokes the FECA, noting that it covers rural carriers who are driving to and from work, and cites language to that effect in the Rural Carrier Handbook, as well as Post Office Operations Manager Brumbaugh's interpretation of that language. (Pl.'s Opp'n at 32.) But the provision in the Rural Carrier Handbook specifically addresses workers' compensation claims, not tort liability, (USA_SJ_611), and the FECA is inapplicable to the issue of tort liability under the FTCA. *See Frankle v. Twedt*, 47 N.W.2d 482, 488 n.4 (Minn. 1951) ("The phrase 'scope of employment,' as used in the field of torts to circumscribe the area of vicarious liability to third persons, is to be sharply differentiated from the workmen's compensation act phrase 'arising out of and in the course of employment.' Compensation acts are Sui generis and belong to a fundamentally different field of litigation.") (internal citations omitted). Moreover, Mr. Brumbaugh's mistaken belief that the same standard applies to FECA and FTCA claims does not bind the USPS regarding whether it waived tort liability to third parties. The question of whether Baron was acting within the scope of employment under the FTCA is not an issue for a post office supervisor to determine, and Brumbaugh conceded that FECA interpretation was not among his job duties. (USA_SJ_471.) Rather, the question of the scope of employment is an issue for the Court, and is subject to the FTCA's limited waiver of sovereign immunity.

As a matter of public policy and fundamental fairness, Plaintiff also contends that a mail carrier should be covered for tort liability, portal to portal, and particularly here, given the nature of the accident. Indeed, this was a tragic accident, but sovereign immunity also implicates public policy, and " FTCA claims are strictly limited to a scope of employment

analysis, regardless of state law doctrines of respondeat superior and apparent authority," *St. John*, 240 F.3d at 678 (citing *Primeaux*, 181 F.3d at 878), or general notions of fairness.

Further, Plaintiff questions Baron's credibility, arguing that his corrections to the September 30, 2015 Trip Report entry suggest the "more likely scenario" that he falsified his time card, and was actually working at the time of the accident, at least sufficient to create disputed questions of material fact. (Pl.'s Opp'n at 7, 34.) But the existence of disputed material facts will not preclude the Court from evaluating the merits of jurisdictional claims, *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 861 (8th Cir. 2013) (citing *Osborn*, 918 F.2d at 729–30 & n.6), and the Court cannot base its determination of subject matter jurisdiction on speculation. *See Gackstetter*, 130 N.W.2d at 329 (rejecting speculative evidence in determining scope of employment).

Here, USPS compensation records show that Baron was paid for time for the week of the accident consistent with logging off at 2:15 on September 30. (USA_SJ_654, 657.) Also, the fact that Baron left work earlier on September 30 is consistent with the notation on his Trip Report stating that a tray of mail was missing that day, which would have comprised 1/3 of Baron's delivery route. (USA_SJ_111, 163–64.) There is no evidence that any trays of undelivered mail remained in Baron's car at the time of the accident, (USA_SJ_115, 171), but even when employees have tools or other items related to employment in their vehicles, courts have found that they were not acting within the scope of employment when going and coming to and from work. *See, e.g., Faul v. Jelco*, 595 P.2d 1035, 1037 (Ariz. Ct. App. 1979) (finding no respondeat superior where employee was involved in an accident while driving to workplace "show up" location, carrying tools);

*Stokes v. Four-State Broadcasters, Inc.*, 300 S.W.2d 426, 428 (Mo. 1957) (finding no vicarious liability where employee picked up work schedule en route to work and was involved in an accident); *S. & W. Constr. Co. v. Bugge*, 13 So.2d 645, 646 (Miss. 1943) (concluding that employer was not liable to injured pedestrian struck by employee's automobile, which contained papers that employer had instructed employee to complete at home).

Plaintiff also points to the fact that Jay Loven had no independent memory of Baron stopping by his shop just prior to the accident, nor did he remember writing the signed statement regarding Baron's visit. (*See* Pl.'s Opp'n at 36–37.) But an electronic copy of the statement was stored in Loven Auto Shop's computer along with the date on which it was generated, Loven acknowledged that the statement was written on his company letterhead and bore his signature, and he testified that he would not have prepared and signed an untruthful statement. (USA_SJ_497–504, 603.)

Ultimately, Plaintiff's speculation about Baron's Trip Report and the errand in Swanville cannot overcome the undisputed fact that when the accident occurred, Baron was several miles away from the closest point of his route, driving north toward his home in Browerville, and away from the Burtrum Post Office. Baron's job duties consisted of sorting mail for his route at the Burtrum Post Office, delivering mail along his defined route, and dropping off any undelivered mail or customer mail at the Burtrum Post Office. (*See* USA_SJ_164–67.) Regardless of the errand at Loven's Auto Shop, it is undisputed that Baron was not at the Burtrum Post Office or driving on his delivery route at the time of the accident. Nor is there any non-speculative evidence showing that he was performing

any of his job duties at the time of the accident.  Under these facts, the Court finds that the accident did not occur within the employer's work-related limits of time and place.

### 2. Whether the Conduct Was of a Kind Authorized by USPS or Reasonably Related to Employment

Regarding whether the conduct was authorized by the USPS or reasonably related to Baron's employment, the Government contends that Baron's drive home and personal errand were not "authorized" by the USPS, nor were they reasonably related to his employment.  (Def.'s Mem. at 24–25.)  Plaintiff argues, however, that Baron's deviation on his route home was not substantial enough to remove his conduct from the scope of his employment, and, in any event, he had "abandoned" the deviation at the time of the accident.  (Pl.'s Opp'n at 35.)

Baron's decision to drive himself home from work, as he routinely did, was not the kind of conduct that the USPS authorized him to perform.  *Murray*, 258 F. Supp. 2d at 1013 (finding that National Guard trainee's choice to drive herself and her friend to school, which she routinely did, was not the kind of conduct that the National Guard authorized her to perform).  Also, the Court finds that Baron's deviation on a personal errand further removed his conduct from the scope of his employment.  Other courts have reached the same result under similar facts.  For instance, in *United States v. Lushbough*, 200 F.2d 717, 721–22 (8th Cir. 1952), the Eighth Circuit found that a federal trainee involved in an accident in South Dakota in a borrowed government vehicle, on his way back to training camp, was not acting within the scope of his employment, as he was picking up his personal laundry and was off duty the entire time.  In *Erby v. United States*, 424 F. Supp. 2d 180,

186–87 (D.D.C. 2006), the court found that the employee had substantially deviated from his assigned postal route at the time of the accident in order to go home and retrieve medication. The plaintiff in *Erby* raised the possibility that the postal worker's route might have extended to other zones, or to certain zones at particular times of the day, but the court found no substantial evidence to that effect, noting that no evidence was introduced that tended to show that the employee had delivered mail on the date of the accident. *Id.* Finally, in *Blythe v. Tarko*, 188 F. Supp. 83, 85–86 (N.D. W. Va. 1960), the court found that a mail carrier was not acting within the scope of his employment at the time of the accident, which occurred after he had stopped at a bar to consume alcohol.

Here, Baron was driving home at the time of the accident. Regardless of whether he ran a personal errand on the way home, all evidence shows that he had completed his work at the Post Office, was traveling away from it, toward his home, and was several miles away from the closest point of his delivery route. The USPS did not authorize this conduct, nor was it reasonably related to Baron's employment, under the law.

### 3. Whether the Conduct Furthered the Interest of the USPS

As to whether Baron's conduct was motivated at least in part by his desire to further his employer's interests, the Government argues that Baron's act of running a personal errand after work and driving home cannot be construed as furthering the interest of the USPS. (Def.'s Mem. at 28–29.)

Plaintiff, however, argues that as a rural mail carrier, Baron was subject to the control of the USPS regarding the type of vehicle that he could drive, for which he received a maintenance allowance. (Pl.'s Opp'n at 33.) In addition, he contends that Baron's

removal of the driver's seat in the Chevy Lumina furthered the interest of the USPS, making it easier for him to deliver mail. (*Id*. at 33–34.) Plaintiff asserts that the USPS had control over the modifications that Baron had made to the vehicle, and performed inspections on his vehicles and evaluated his driving habits. (*Id*.)

Again, the Court's analysis is limited to the scope of employment, and the relevant conduct here was Baron's act in driving home from work. Baron's removal of the front seat of his car and the USPS vehicle inspections are issues that pertain to negligence.

For an employer to be liable for the acts of an employee, the employee must be acting primarily for the employer's benefit at the time of the tort. *See Gackstetter*, 130 N.W.2d at 150. But "[i]f the tort is committed when the [employee] is in pursuit of activity personal to himself, the [employer] is not liable." *Id*. There may have been some residual benefit to the USPS in Baron's use of his personal vehicle to deliver mail, or stopping to pay a bill for a personal vehicle that he used on his rural route. However, these benefits are too tenuous to create employer liability. There is no evidence that Baron had any postal trays in his car at the time of the accident, or was otherwise "on call." Instead, he was off duty, driving home after completing work and running a personal errand. His conduct did not further the interest of the USPS sufficient to confer liability. *See Murray*, 258 F. Supp.2d at 1013 (National Guard trainee's act of commuting to school, while of some residual benefit to the National Guard, was insufficient basis for employer liability); *Hentges*, 569 N.W.2d at 429 (finding residual benefit of fostering pastoral-parishioner relationships too tenuous in connection with pastor's 24-hour "on call" employment to

support finding that he was acting within scope of employment when he accidentally shot and killed a parishioner while deer hunting with him).

### 4. Whether the Employer Should Have Foreseen the Employee's Conduct, Given the Nature of Employment and Related Duties

Finally, as to whether the USPS should have foreseen Baron's conduct, given the nature of his employment and the duties relating to it, the Government argues that his conduct was not foreseeable so as to support employer liability under Minnesota law. (Def.'s Mem. at 30.)

The Court agrees. In *Western National Mutual Insurance Co. v. United States*, 964 F. Supp. 295, 297–98 (D. Minn. 1997), the court applied Minnesota law to find that an off-duty FBI agent's use of an FBI vehicle to pick up his daughter was entirely personal and unforeseeable by his employer, the United States. The court in *Murray* reached the same conclusion about the off-duty actions of a National Guard trainee who was not acting as a recruiter at the time of the incident, and whose conduct could not have been foreseen or controlled by the National Guard. 258 F.2d at 1013. Baron was off duty, driving his personal vehicle home, and not acting as a postal mail carrier at the time of the accident. His actions could not have been foreseen or controlled by the USPS.

Accordingly, for all of the above reasons, the Court finds that Baron was not acting within the scope of employment when the accident occurred, sufficient to support subject matter jurisdiction for a negligence claim under the FTCA.

### D. Negligent Supervision

In support of his claim for negligent supervision, Plaintiff contends that the USPS had notice of Baron's unauthorized vehicle modifications, and failed to properly inspect and correct the modifications. (Pl.'s Opp'n at 24–25.)

Defendant argues that because Plaintiff cannot establish Baron was acting within the scope of his employment at the time of the accident, he likewise cannot establish that the USPS negligently supervised him. (Def.'s Mem. at 32.)

Under Minnesota law, because negligent supervision derives from the respondeat superior doctrine, in order to successfully state a claim against an employer, "the claimant must first establish that the employee who caused an injury did so within the scope of his or her employment." *Cook v. Greyhound Lines, Inc.*, 847 F. Supp. 725, 732 (D. Minn. 1994) (applying Minnesota law to motion to amend complaint to allege claim for negligent supervision); *see also M.L. v. Magnuson*, 531 N.W.2d 849, 858 (Minn. Ct. App. 1995) ("Negligent supervision derives from the doctrine of respondeat superior so the claimant must prove that the employee's actions occurred within the scope of employment in order to succeed on this claim."), *review denied* (Minn. July 20, 1995)). Here, because the tort did not occur within the scope of employment, liability for negligent supervision cannot be extended outside the scope of employment. *See* 28 U.S.C. § 1346(b)(1); *Primeaux*, 181 F.3d at 878–81. Accordingly, the Court lacks subject matter jurisdiction over Plaintiff's negligent supervision claim.

## III. CONCLUSION

While the Court sympathizes with Plaintiff's loss of his mother under tragic circumstances, the Court is required to determine immunity based on the law discussed above, as applied to the facts of the case. Under Minnesota law, the Court finds that Plaintiff has failed to show that Baron was acting within the scope of his employment at the time of the accident. Accordingly, sovereign immunity is not waived, and the Court lacks subject matter jurisdiction over Plaintiff's FTCA claims, which are dismissed without prejudice. *See Hart v. United States*, 630 F.3d 1085, 1091 (8th Cir. 2011) (affirming but modifying judgment to be without prejudice where the district court found subject matter jurisdiction lacking and dismissed the complaint with prejudice).

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. The Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) [Doc. No. 44] filed by Defendant United States of America is **GRANTED**; and

2. This matter is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 7, 2021                                     s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge